# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**JOAN LYNCH,**
    **PLAINTIFF**

**CASE NO. 1:08CV00453**
**(WEBER, J.)**
**(HOGAN, M.J.)**

    **VS.**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**
    **DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff filed her applications for Disability Insurance Benefits and Supplemental Security Income in September, 2002. Her alleged onset date was August 18, 2002. Her applications were denied, both initially and upon reconsideration. She then requested and obtained a hearing before an Administrative Law Judge (ALJ) in August, 2005 at Dayton, Ohio. Plaintiff, who was represented by counsel, testified as did Vocational Expert (VE) Suman Srinivasan. The ALJ reached an unfavorable decision in May, 2006 and Plaintiff processed an appeal to the Appeals Council, which granted review and remanded the claim. A second hearing was held before the same ALJ in June, 2007. A second unfavorable decision was rendered in August, 2007. Plaintiff again requested review by the Appeals Council, which denied review in May, 2008. Plaintiff, having exhausted her administrative remedies, sought judicial review by filing her Complaint in July, 2008.

## STATEMENTS OF ERROR

Plaintiff asserts that the ALJ made two errors that prejudicially influenced the ALJ's decision in this case. First, she argues that the ALJ erred by rejecting the opinion of the treating psychiatrist, Dr. Mahajan, in favor of other non-treating medical sources. Second, she argues

that the decision was not based on substantial evidence in the record. We find the two to be interrelated.

## PLAINTIFF'S TESTIMONY AT THE HEARINGS

Plaintiff testified that she was unmarried and living with her parents in a private home in Carlisle, Ohio. Her children, ages 7 and 14 live down the street with a friend. She said that she does not drive because she has neither a drivers license nor insurance and was receiving welfare benefits at the rate of $338 per month and food stamps at the rate of $352 per month. She last worked in September, 2002 as a server, but quit because "of the problem with my heart and the problem with my hand." The heart problem resulted in open-heart surgery in February, 2004. Her post-surgical symptoms were shortness of breath and lack of energy. Her cardiologist is Dr. Schwartz, whom she sees twice per year. She also identified Dr. Campbell as a physician she sees for her heart condition. A blood clot in her hand caused her to lose the tips of three fingers on her right or dominant hand. As a result, she has difficulty holding things and frequently drops things. In addition, she had a seizure in December, 2004. She sees Dr. Merryman for her seizure disorder on a quarterly basis and is taking medication for that problem. She was advised by her doctor not to bathe in a tub. Her post-seizure symptoms include memory loss and an attention deficit.

Plaintiff testified that she suffers from anxiety and depression, for which she treats at Eastway and sees Dr. Collares for prescribed medication. She admitted to having a drug problem, goes to Project Cure every day and receives methadone treatment. She has no criminal history of drug abuse. She said that her doctor advised her not to lift over 20 lbs. because of her heart. She gets winded after climbing stairs. She sleeps only 5 hours per night with the help of medication, but is able to cook, use a vacuum, do laundry, make her bed and watch television. She eats sporadically. (Tr. 755-773).

At her second hearing a little less than two years after her first, she identified Dr. Mahajan as the doctor she has been seeing for a four-year period at the rate of once per month. She admitted to the use of "street drugs" in December, 2006, when she last attended Project Cure.

2

She testified that she has been "clean" ever since. Plaintiff testified that she could walk for 10-15 minutes, stand for 15-20 minutes and has no difficulty sitting. She smokes against medical advice to calm her nerves. Plaintiff testified that her attention span is about the same since her previous hearing, but her memory is worse. (Tr. 782-796).

## THE MEDICAL EXPERT

Dr. Mary Buban, a clinical psychologist, provided testimony as a medical expert. Dr. Buban reviewed Plaintiff's medical record. In 1990, Plaintiff had endocarditis with a distal emboly, which was secondary to her drug abuse. Dr. McIntosh diagnosed Plaintiff with opioid dependence, early remission with methadone maintenance and depressed mood in November, 2002. Dr. McIntosh assigned a GAF of 60. Her ability to understand, remember and carry out one to two-step job instructions was moderately intact. She could interact appropriately with supervisors and coworkers. Her ability to withstand stress was mildly to moderately limited. She was able to concentrate and maintain attention.

Records from Eastway Behavioral Healthcare indicate that Plaintiff was prescribed Lexapro, Desseryl and Xanax and that she reported being depressed and anxious. Therapists there wanted her to continue psychotherapy and medication management. Eastway's diagnosis was Dysthymic Disorder. A GAF of 50 was assigned. Because of the addicting potential of Xanax, therapists at Eastway wanted Plaintiff, because of her past history, to put the emphasis on psychotherapy and anxiety reduction techniques. In August, 2003, Plaintiff admitted to recent drug use, despite being on methadone.

Dr. Rosenthal evaluated Plaintiff in March, 2005 and found only a fair limitation of Plaintiff's ability to accept instruction and respond appropriately to criticism. Otherwise, her ability to function is the workplace was good. Dr. Rosenthal's diagnosis was an Adjustment Disorder with a GAF of 60. Plaintiff had a seizure in December, 2004 and following the seizure, she had some problems with confusion and memory.

Plaintiff's family situation was a stressor. She lost her independent housing in 2004 and moved in with her mother. At that time, she was attempting to obtain custody of her two

3

children, but her mother felt that she wasn't stable enough to function as a parent.

In 2004, Eastway's diagnosis was Dysthymic Disorder. The GAF was 45. Dr. Gilchrist, a neuropsychologist, found that Plaintiff had a low average IQ and some difficulty with sustained attention, concentration and processing speed, but her memory was normal. Dr. Gilchrist felt that Plaintiff had a moderate degree of depression.

Dr. Merryman opined that Plaintiff had marked restrictions in all areas of work-related functions in 2006. Dr. Merryman's diagnosis was substance abuse and major depression, but a GAF of 60, indicative of mild restrictions, is inconsistent. The treatment notes say that appearance, demeanor, activities and speech were normal; thought process was coherent, no delusions; perception, mood and affect are normal; no suicidal ideation; behavior is cooperative; cognition is intact. Her insight and judgment are normal. Her appetite is good; depression and anxiety are stable with medication.

Dr. Buban said that Plaintiff was discharged from the Methadone Clinic in January, 2007 for being noncompliant with treatment and dealing drugs in the vicinity of the clinic. The Clinic's diagnosis was opioid heroin dependency. Dr. Buban's opinion was that Plaintiff suffers from a mild situational depressive disorder and does not meet Listing 12.09. Dr. Buban felt that Plaintiff's level of stress would preclude her from working at a job that requires production quotas and that her drug abuse history would preclude her from any job that involves handling drugs or alcohol. (Tr. 796-807).

## THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The hypothetical person presented to the VE is limited to light exertion. The right hand is limited in assisting the left hand with lifting. The person can manipulate, fine and gross, with the right hand on only an occasional basis. The person cannot climb ladders or scaffolds, work at unprotected heights or operate machinery. The person can frequently bend, stoop, balance, kneel, crouch or crawl. The person can perform unskilled and simple tasks and should not perform fast-paced work or work with production quotas. The VE responded that Plaintiff could not perform her past relevant work as a server, but could perform the jobs of counter clerk and packaging

4

machine operator at the light exertional level and the jobs of surveillance system monitor and dowel inspector at the sedentary level. The jobs identified existed in representative numbers in the national economy.

## THE DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that Plaintiff has the following severe impairments: residuals of amputation of finger tips on three fingers of the right hand, history of aortic insufficiency and residuals of aortic valve replacement, adjustment disorder with depressed mood, polysubstance addiction disorder and questionable seizure disorder. The ALJ determined that Plaintiff did not meet any Listing, but retained the residual functional capacity to perform a limited range of light and sedentary work. Plaintiff was determined not to be disabled and unable to participate in the Social security fund.

## THE MEDICAL RECORD

Plaintiff sustained an "oblique fracture of the distal ulna" and a "comminuted fracture of the distal radius" (left wrist) when a tire she was inflating exploded. The wrist was reduced at Middletown Regional Hospital by Anthony Checroun, M.D., in July, 2001. (Tr.125-130).

Plaintiff was admitted to Middletown Regional Hospital in August, 2002 for a "right brachial embolectomy," caused by an injection of foreign material. Plaintiff was known to be a drug user. An electrocardiagram showed a "mild left atrial enlargement with mild left ventricular enlargement." Plaintiff underwent surgery and was discharged after a 5-day stay. Hospital records showed that a similar procedure in 1990 was done previously when Plaintiff had an "embolectomy" for a clot in her right leg. She has a history of aortic insufficiency, secondary to endocarditis, since 1990 and has continued to smoke. (Tr. 131-155). In August, 2002, Plaintiff's carotid ultrasound showed a "normal arterial flow." (Tr. 156-164).

In September, 2002, Gary Cobb, M.D. reported that the tips of Plaintiff's thumb and index finger were gangrenous and that she was likely to lose them as a result of an emboli in the

5

right hand. (Tr. 166-167).

J. William McIntosh, Ph.D., a clinical psychologist, evaluated Plaintiff in December, 2002. Dr. McIntosh diagnosed her with opioid dependence, early full remission with methadone maintenance and an adjustment disorder with depressed mood. Her last employment was as a waitress at Frisch's in September, 2002, a job she left because of a blood clot in her right hand. She has had a 20-year history of opioid abuse and dependence and attended the Methadone Maintenance Clinic on a daily basis. Dr. McIntosh said that Plaintiff's ability to remember, understand and carry out one and two-step instructions was "moderately intact." He felt she "should be able to interact appropriately with supervisors and coworkers." She has a "mild to moderate" limitation of her ability to withstand stress, but her ability to concentrate and attend for simple repetitive tasks "seems fairly good." Dr. McIntosh suggested a payee be appointed in the event Plaintiff receives benefits because of her drug abuse history. (Tr. 168-172).

A paper review was done in January, 2003 by Douglas Pawlarczyk, Ph.D., also a clinical psychologist. Dr. Pawlarczyk's diagnosis was "adjustment disorder with depressed mood." He felt that Plaintiff's impairment was not severe and that she had only mild difficulties performing the activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace. He said that she had "some symptoms of depression." (Tr. 173-186).

Plaintiff was also evaluated by Mary Johnson, M.D., in February, 2003. Her chief complaints at that time were aortic valve insufficiency and amputation of two fingers of her right hand. The history disclosed to Dr. Johnson that Plaintiff had been diagnosed with endocarditis in 1990, had been diagnosed with an embolus in the right upper extremity in late 2002 and had been treated for aortic insufficiency, the symptoms of which are chest pain and shortness of breath after minimal exertion, with Coumadin therapy. She has smoked for 29 years. After a physical examination, Dr. Johnson concluded that Plaintiff has "decreased use of her right hand" as a result of the finger amputations and "normal use of her left hand," although she had a decreased range of motion in the left elbow and wrist as a result of a previous fracture. Dr. Johnson opined that Plaintiff could perform "sedentary, light and occasional moderate physical duties." Her diagnosis was "H/O drug abuse, persistent endocarditis, embolism of the right upper extremity resulting in amputation and hypertension," which was well-controlled. (Tr. 187-194).

6

A further medical review was conducted in March, 2003 by Paul Heban, M.D., who said that Plaintiff could lift 20 lbs. occasionally and 10 lbs. frequently. She could stand/walk for 6 hours in a workday and sit for 6 hours. She could frequently climb ramps or stairs, but should never climb ladders of scaffolds. She has a limited ability to handle and finger. "Plaintiff's manipulation, pinch and fine coordination are abnormal with respect to the right hand, secondary to the amputations." (Tr. 195-202).

An echocardiagram in August, 2003, disclosed an enlarged left ventricle with mildly diminished function, a mildly thickened mitral valve, a thickened aortic valve and moderate mitral regurgitation. (Tr. 204-205).

In July, 2003, Robert Pelberg, M.D., a cardiologist with the Ohio Heart Health Center in Middletown, reported that Plaintiff has a history of "prior subacute bacterial endocarditis secondary to drug abuse with resulting significant aortic insufficiency" and "mitral regurgitation." Dr. Pelberg commented that "[h]er dyspnea on exertion is not necessarily attributable to aortic insufficiency as she is a significant smoker." Her hypertension is well-controlled. The fact that Plaintiff has been noncompliant with follow-up visits was of concern since Plaintiff is on Coumadin. She was advised to quit smoking. (Tr. 206-211).

In September, 2002, Paul Rogers, M.D., also a cardiologist with Ohio Heart Health, saw Plaintiff after she was hospitalized for the embolus to her left hand. Her symptoms included being tired, shortness of breath after exertion and heartburn. Because this was Plaintiff's second embolus, she was again advised to stop smoking. (Tr. 211-214).

Tarek Moussa, M.D. with Sycamore Primary Care Group, reported in September, 2003 that Plaintiff complained about multiple symptoms: shortness of breath, dizziness, a racing heart and fatigue. Dr. Moussa's assessment was "valvular lesion with murmur auscultated" and "possible aortic stenosis." (Tr. 219-224).

A Mental Residual Functional Capacity Assessment was completed in October, 2003 by Robelyn Marlow, Ph.D., a clinical psychologist. Dr. Marlow determined that Plaintiff had no deficits in the area of adaptation or understanding and memory, but moderate limitations of her ability to maintain attention and concentration for extended periods, interact appropriately with the public and complete a normal work week without interruptions from psychologically-based

7

symptoms. She is a high school graduate who "can handle the demands of simple repetitive work." Dr. Marlow's diagnosis was "adjustment disorder with depressed mood." In Dr. Marlow's opinion, Plaintiff had only mild limitations of her ability to perform the activities of daily living, but mild to moderate difficulties maintaining social function and maintaining concentration, persistence or pace. (Tr. 225-240).

In August, 2002, Plaintiff injured her wrist accidentally and then noticed that her right hand was cold and changing color. There was no radial or ulnar pulse. She was diagnosed with a embolic occlusion of the right hand and admitted to surgery. Gary Cobb, M.D., the surgeon, performed a distal amputation of the 1st, 2d and 3rd fingers of Plaintiff's right hand as these tissues were gangrenous. Plaintiff is a smoker, former drug user and had a prior embolectomy in a leg. (Tr. 241-245).

In August, 2003, Dr. Pelberg reported that Plaintiff had "severe aortic insufficiency, a bicuspid valve damaged by past endocarditis, mild to moderate mitral regurgitation." She had dyspnea on exertion. Dr. Pelberg recommended cardiac catheterization, followed by surgery with aortic valve replacement and mitral valve replacement or repair. (Tr. 246-247). An echocardiogram confirmed the initial diagnosis. (Tr. 246-251).

Plaintiff saw James Campbell, a cardiac surgeon, at Kettering Medical Center in January, 2004. Dr. Campbell's assessment was "severe aortic stenosis with severe aortic insufficiency" and "endocarditis secondary to intravenous drug abuse." The treatment plan was for aortic valve replacement. (Tr. 258-260). Plaintiff had the surgery by Dr. Campbell in March, 2004. She was discharged four days after admission and had an uneventful recovery period. She was returned to the care of Brian Schwartz, M.D., her cardiologist. (Tr. 261-292).

Plaintiff entered Project Cure in December, 1999 and continued through 2004. She was on a daily methadone regimen with urine drug screens and she also was seen by therapists. (Tr. 293-390). From the progress notes, one gets the impression that her stressors were: the drug addiction and related physical problems, previously documented in the record; her relationships with her family, particularly her parents and children; the men in her life, who have generally been unsupportive, and her problems with housing.

In October, 2004, Dr. Schwartz reported that after the cardiac surgery, Plaintiff's ejection

8

fraction returned to normal and her dyspnea improved. Dr. Schwartz said that Plaintiff would have to remain on Coumadin, a situation which would increase her risk of bruising and bleeding if injured, but that she had no major cardiac limitations. (Tr. 391-392). In October, 2003, Dr. Schwartz reported to Dr. Moussa that Plaintiff had "severe aortic valve disease with both stenosis and regurgitation." He recommended cardiac catheterization and aortic valve replacement. He also recommended that Plaintiff stop smoking. (Tr. 295-396).

A medical residual functional capacity assessment was done in February, 2005 by an internist whose name we cannot decipher. That physician made his/her findings based on an examination conducted in February, 2003. In any event, the mystery physician determined that Plaintiff could frequently lift 20 lbs. and that standing, walking and sitting were unaffected. There were no postural limitations. Plaintiff's only limitations were handling and fingering because of her finger amputations. (Tr. 398-401).

James Rosenthal, Psy.D., evaluated Plaintiff in March, 2005. Dr. Rosenthal diagnosed Plaintiff with an adjustment disorder with depressed mood. He assigned a GAF of 60. Dr. Rosenthal's opinion was that Plaintiff had the ability to understand, remember and follow simple one or two-step job instructions. Her ability to relate to supervisors and coworkers was not impaired. He ability to attend and concentrate was mildly impaired and her ability to handle stress was mildly to moderately impaired. The source of Plaintiff's "situational depression" was her inability to work and earn income, her parents inability to support her and her children for a lengthy period and her concern for hers and her children's future. Dr. Rosenthal felt that Plaintiff's ability to accept instruction and respond appropriately to criticism from supervisors was "fair." (Tr. 402-408).

Leila Khorashadi, M.D., reported in December, 2004, that Plaintiff was admitted to Kettering Medical Center for "changes in her mental status" after suffering a seizure the following day. Doctors were unable to determine the cause of the seizure, but treated her with Dilantin and discharged her after a normal neurological examination. ( Tr. 409-477).

An echocardiogram was done in December, 2004 by Gary Pauls, M.D., who reported "normal right and left ventricles with an ejection fraction of 60%, trace mitral regurgitation, normal aortic valve, mild tricuspid regurgitation and no intracardiac masses or vegetations."

9

(Tr. 478-480). An electroencephalogram, also performed in December, 2004 showed a "spindle sleep pattern," brain stem level dysfunction sometimes seen in patients with circulatory problems. (Tr., Pgs 481-488).

Plaintiff was referred by Sharon Merryman, D.O., an osteopath specializing in neurology, to James Gilchrist, Ph.D., a neuropsychologist, in April, 2005 after "mental status changes," apparently resulting from two incidents of encephalopathy in November, 2004 and in December, 2004. Dr. Gilchrist found that Plaintiff was of low average intelligence and that her memory was in line with her intellectual ability. She has a "prolonged history of drug abuse" and exhibited a "mild to moderate degree of depression." Her cognitive function appeared to be improving, although Plaintiff reported that it has not yet returned to baseline functioning. (Tr. 504-508).

Dr. Merryman reported in June, 2005 that Plaintiff was still seeing a counselor at Project Cure and was still on methadone and Coumadin, but had no chest pain, nor shortness of breath. Smoking cessation was recommended as was walking and reading. Tub baths, swimming and driving were prohibited. Dr. Merryman said that Plaintiff did not have the attention span to attend class all day because of her depression. (Tr. 509-513).

Plaintiff was admitted to the Kettering Medical Center in November, 2004. It was felt that she had a seizure secondary to hypoglycemia. Dr. Merryman said that she treated Plaintiff from December, 2004 to June, 2005. Dr. Merryman opined that Plaintiff would be prompt and regular in attendance, but would not respond appropriately to supervision, co-workers and customary work pressures, would not withstand the pressure of meeting normal standards of work productivity, sustain attention and concentration or understand, remember and carry out simple work instructions. In Dr. Merryman's opinion, Plaintiff would not behave in an emotionally stable manner, relate predictably in social situations , demonstrate reliability or perform activities within a schedule. She would not complete a normal workweek without interruptions from psychologically or physically based symptoms, respond appropriately to changes, get along with coworkers or sustain an ordinary routine without supervision. She would not be able to work with others without being unduly distracted and would not accept criticism and respond appropriately to criticism. Dr. Merryman felt that Plaintiff had "marked" restrictions of her ability to perform the activities of daily living, maintain social functioning and

10

concentrate, persist and keep pace. (Tr. 517-526).

Dr. Mahajan, a board certified psychiatrist, said that he treated Plaintiff for approximately one year, that she suffered from depression, anxiety, unstable moods and an inability to cope with day to day stress. Dr. Mahajan opined that Plaintiff would not be prompt and regular in attendance and would not respond appropriately to supervision, coworkers and customary work pressures. She would be able to understand, remember and carry out simple work instructions, but would not be able to sustain attention and concentration and would not be able to withstand the pressure of meeting normal work productivity. She would not behave in an emotionally stable manner, relate predictably in social situations nor demonstrate reliability. She would not be able to sustain attention and concentration for extended periods, perform activities within a schedule nor complete a normal workweek without interruptions from physically or psychologically-based symptoms. She would not respond appropriately to changes, get along with coworkers without unduly distracting them or sustain an ordinary routine, respond appropriately to criticism or work in proximity to others without being unduly distracted by them. (Tr. 574-583). Dr. Mahajan rated "poor" Plaintiff's ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently and maintain concentration and attention. Dr. Mahajan said that Plaintiff had a fair ability to understand, remember and carry out simple job instructions, but had a poor ability to understand, remember and carry out detailed, but not complex, job instructions and a poor ability to maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (Tr. 583-586).

Plaintiff treated with Eastway Behavioral Healthcare for a considerable time, slightly less than two years from October. 2005. She has a limited support system, comprised of her mother, a sister and brother and few friends. Her strengths are that she is "persistent, strong-willed, always trying." She is unemployed and has no car and can't drive if she did. She lives in very limited space and has had persistent anxiety and depression as well as sleep difficulties. She has been married twice and both "husbands" were physically abusive. (Tr. 634-669).

Plaintiff attended Project Cure for about six years, starting in December, 1999. She was discharged for "duel enrollment" with "two methadone providers." (Tr. 670).

11

# OPINION

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether

the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321 (6th Cir. 1978); *Phillips v. Harris*, 488 F. Supp. 1161 (W.D. Va. 1980). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *see Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42

13

U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, the mere presence of a mental impairment does not establish entitlement to disability benefits. In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings. 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments. Once the Commissioner determines that a mental impairment exists, he/she must then evaluate the degree of functional loss it causes according to a special procedure. 20 C.F.R. §§ 404.1520a and 416.920a. A standard document, called the Psychiatric Review Technique Form, must be completed at each level of administrative review. This form, which corresponds to the Listing of Impairments for mental impairments, lists the signs, symptoms, and other medical findings which establishes the existence of a mental impairment.

The special procedure then requires a rating of the degree of functional loss resulting from the impairment. 20 C.F.R §§ 404.1520a(b)(2) and 416.920a(b)(2). Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings. 20 C.F.R. §§ 404.1520a(c)(3)and 416.920a(c)(3); *see Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993)(per curiam). The first three areas are rated on the following five-point scale: none, mild, moderate, marked, and extreme. The fourth is rated on the following four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. 20 C.F.R. §§ 404.1520a(c)(4)and 416.920a(c)(4).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then complete a Mental Residual Functional Capacity Assessment form. This form also seeks to evaluate functional loss; however, it is intended to provide a more detailed analysis than that provided by the Psychiatric Review Technique form. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are

14

compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

In order to receive benefits, an individual must follow the treatment prescribed by his/her physician if the treatment will restore the ability to work, unless there is an acceptable reason for the failure to follow the treatment. 20 C.F.R. § 404.1530; *see Awad v. Secretary of H.H.S.*, 734 F.2d 288 (6th Cir. 1984); *Fraley v. Secretary of H.H.S.*, 733 F.2d 437 (6th Cir. 1984). Acceptable reasons for failure to follow prescribed treatment include, but are not limited to: 1) the treatment is contrary to plaintiff's religious beliefs; 2) plaintiff is unwilling to repeat a surgery which was previously unsuccessful; and 3) the treatment involves great or unusual risk. 20 C.F.R. § 404.1530(c). If an impairment can reasonably be controlled, or is reasonably amenable to treatment, it cannot serve as a basis for a finding of disability. *Young v. Califano*, 633 F.2d 469, 472-73 (6th Cir. 1980); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir.), *cert. denied*, 389 U.S. 993 (1967), *reh'g denied*, 389 U.S. 1060 (1968).

Benefits may not be denied, however, if the treatment is merely recommended, suggested, or offered as an alternative, as opposed to treatment being ordered or prescribed. *Harris v. Heckler*, 756 F.2d 431, 435 n.2 (6th Cir. 1985); *Young*, 633 F.2d at 472-73. The Commissioner may not presume that impairments are remediable; the record must show that the treatment will restore plaintiff's ability to work. *Johnson v. Secretary of H.H.S.*, 794 F.2d 1106, 1111-13 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435 n.2.

A treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1054 (6th Cir. 1983). A summary by an attending physician made over a period of time need not be accompanied by a description of the specific tests in order to be regarded as credible and substantial. *Cornett v. Califano*, No. C-1-78-433 (S.D. Ohio Feb. 7, 1979) (LEXIS, Genfed library, Dist. file). A physician's statement that plaintiff is disabled is not determinative of the ultimate issue. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). The weight given a treating physician's opinion on the nature and severity of impairments depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record. 20 C.F.R. § 404.1527(d); *Harris v. Heckler*, 756 F.2d 431 (6th Cir. 1985). If not contradicted by any

15

substantial evidence, a treating physician's medical opinions and diagnoses are afforded complete deference. *Harris*, 756 F.2d at 435. *See also Cohen v. Secretary of H.H.S.*, 964 F.2d 524, 528 (6th Cir. 1992). While the Commissioner may have expertise in some matters, this expertise cannot supplant the medical expert. *Hall v. Celebrezze,* 314 F.2d 686, 690 (6th Cir. 1963); *Lachey v. Secretary of H.H.S.,* 508 F. Supp. 726, 730 (S.D. Ohio 1981).

It is the Commissioner's function to resolve conflicts in the medical evidence and to determine issues of credibility. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The Commissioner's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). The Commissioner must state not only the evidence considered which supports the conclusion but must also give some indication of the evidence rejected in order to facilitate meaningful judicial review. *Hurst v. Secretary of H.H.S.*, 753 F.2d 517, 519 (6th Cir. 1985). *See also Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. Jan. 2, 1990) (unpublished, available on Westlaw). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the

16

Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

Plaintiff first takes issue with the ALJ's finding relative to Dr. Mahajan, a treating psychiatrist. The ALJ's failure to give Dr. Mahajan's report more weight was due to several factors: (1) the fact that Plaintiff first saw Dr. Mahajan in November, 2005 and for approximately 12 times through April, 2007; (2) since duplicate reports were submitted and Plaintiff testified to more contacts than Dr. Mahajan did, there was an effort to deceive: (By whom? The doctor who has no interest in the case, Plaintiff's lawyer, who would know that no judge is impressed by the submission of repetitive or useless information or Plaintiff, who didn't file anything, save her application; (3) Plaintiff hid from Dr. Mahajan her considerable drug abuse history; (4) Dr. Mahajan's "normal" findings conflict with his "marked" limitations. We disagree that the first two and the fourth reasons justify departing from Dr. Mahajan's opinion, however, the third reason does have a negative effect on the credibility of Dr. Mahajan's opinion. The real question, however, is whether Dr. Mahajan's opinion is supported by substantial evidence in the record and the answer is dispositive of this issue.

The first observation that one must make is that Plaintiff has a host of reasons why she might feel depressed and anxious. First, she lives in the basement of her parents' home and her children live down the street with a friend. Second, she is unemployed and has no independent source of income save welfare. Third, she has had a long-standing addiction to drugs, has suffered several relapses and has endured both blood clots, cardiac problems and finger amputations as a direct result of drug abuse. Fourth, she has been married twice to abusive

17

persons and divorced. However, the fact that Plaintiff suffers from depression is neither contested, nor does it affect the ultimate resolution of this case. The real question concerns how Plaintiff is able to function and what she can do despite her depression. In this respect, her situation was reviewed by a number of specialists in the mental health area, whose contact with Plaintiff differed in scope.

Dr. McIntosh, a clinical psychologist, evaluated Plaintiff in December, 2002. He found no marked limitations of Plaintiff's ability to function in the workplace. Dr. McIntosh saw no problem with Plaintiff's ability to interact with co-workers and supervisors. Her ability to withstand stress was mildly to moderately limited. Dr. McIntosh's opinion was that Plaintiff had the ability to concentrate and attend for simple repetitive tasks and that she had the capacity to understand, remember and carry out such tasks. Plaintiff was clinically interviewed by Dr. McIntosh, but was neither treated nor tested by him, although certain documents, not otherwise described, were reviewed.

Dr. Pawlarcyyk, also a clinical psychologist, conducted a paper review in January, 2003. Dr. Pawlarczyk regarded Plaintiff's limitations in all three general categories, ability to perform the functions of everyday living, ability to maintain social function and ability to concentrate, attend and keep pace, as only mildly limited. Admittedly, Dr. Pawlarczyk neither examined, treated nor tested Plaintiff.

Dr. Marlow, also a clinical psychologist, conducted a second paper review in October, 2003. Dr. Marlow's opinion regarding Plaintiff's limitations, was slightly more helpful to Plaintiff. Dr. Marlow's opinion was that Plaintiff had mild limitation of her ability to perform the activities of daily living, but she felt that Plaintiff had mild to moderate limitations in the other two areas, ability to maintain social function and the ability to concentrate, attend and keep pace.

Dr. Rosenthal, also a clinical psychologist, evaluated Plaintiff in March, 2005. Dr. Rosenthal is not a treating source, but he examined and tested Plaintiff. Dr. Rosenthal's opinion was that Plaintiff had the capacity to understand, remember and follow simple one or two-step instructions and had the ability to relate to supervisors and co-workers. Dr. Rosenthal's opinion was that Plaintiff's ability to concentrate and attend was mildly impaired, but her ability to

18

handle stress was mildly to moderately impaired.

Dr. Merryman is an osteopathic physician specializing in neurology, a somewhat allied field to psychiatry. Dr. Merryman is clearly a treating source, who also referred Plaintiff to a neuropsychologist, Dr. Gilchrist. Dr. Merryman's opinion stands in stark contrast to the opinions of all the non-treating sources. Her opinion was that Plaintiff had marked limitations in all relevant categories, the ability to perform the activities of daily living, maintain social function and concentrate, attend and keep pace. Dr. Merryman's treatment of Plaintiff spans the period from November, 2004 to August, 2005. Dr. Gilchrist also both examined and tested Plaintiff in the Spring of 2005. Dr. Gilchrist saw Plaintiff following two episodes of "mental status change," resulting from apparent seizures in November and December, 2004. Dr. Gilchrist found that Plaintiff was making "some steady and consistent improvement" in her mental status. Dr. Gilchrist said that Plaintiff was of low average intelligence and had "some difficulties with attention and concentration."

Dr. Mahajan is a board certified psychiatrist and a treating source. Dr. Mahajan said that he last saw Plaintiff in September, 2006 and that he had treated her for approximately one year. Dr. Mahajan agreed with almost everyone that Plaintiff had the mental capacity to understand, remember and carry out simple work instructions. Dr. Mahajan's opinion, however, was that Plaintiff had a moderate restriction of her ability to perform the activities of daily living, but a marked restriction of her ability to maintain social function and a marked restriction of her ability to concentrate, persist and keep pace. It is significant that the ALJ described Dr. Mahajan's contact with Plaintiff as "medication monitoring,"while Dr. Mahajan described his contacts as "interviews and long follow up." Only a brief review of Dr. Mahajan's records clearly shows that his contacts with Plaintiff were more extensive than medication monitoring. Whether Dr. Mahajan personally conducted therapeutic sessions with Plaintiff or some were delegated to someone with psychological, rather than medical training, is an irrelevant consideration. Dr. Mahajan voiced the opinion and his opinion is obviously based on all the information at his disposal at the time.

The ALJ is sharply critical of Dr. Mahajan's mental status exams as being "essentially normal." and accuses him of opining that "the claimant had essentially no mental abilities for

19

work." We disagree with that criticism. It is quite clear from Dr. Mahajan's reports that the major problems he sees with Plaintiff are not in the areas of intelligence and ability to understand, but in the areas of attention-concentration and Plaintiff's ability to handle stress. The fact that Dr. Mahajan's office notes show intact thought processes and intact thought content as well as normal perception and cooperative behavior is not inconsistent with his opinion relative to Plaintiff's ability to handle stress and concentrate, attend and keep pace. It is significant that the only other treating physician, Dr. Merryman, agreed with Dr. Mahajan on Plaintiff's ability to concentrate and attend and her ability to withstand stress. The ALJ's reliance on non-treating sources to rebut these conclusions was erroneous.

On the other hand, we see no reference in Dr. Mahajan's records that Plaintiff ever discussed her problems with drug abuse, which may have been a significant, if not the most significant, factor which led to her situational depression. We also understand that Plaintiff's dismissal from Project Cure was based on dual registration with another methadone clinic. This fact supports dual inferences, that Plaintiff had a significant drug abuse problem in January, 2007 or that Plaintiff somehow misunderstood directions or moved so that one agency's jurisdiction was terminated. However if the record on remand shows that Plaintiff was actually obtaining methadone from two sources at the same time, the first inference would be based on solid ground.

Whether or nor drug abuse was a contributing factor to Plaintiff's limitations is not answered by the medical record in this case. Plaintiff's history with Project Cure was not the most cooperative, but she did have a number of negative drug screens. Thus, we cannot say on the basis of this record whether Plaintiff's drug abuse was a material and contributing factor to her inability to concentrate and attend and her inability to handle stress or whether she would have these limitations in the absence of her past and/or present problems with drugs. For this reason, we find that a remand under Sentence Four is appropriate as "all of the essential factual issues have not yet been resolved." *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994); *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994)

After a thorough and complete review of all the evidence in this case, we find the ALJ's failure to accept the above two conclusions of treating physicians, Merryman and Mahajan, to be

20

erroneous, and recommend a REMAND to determine whether these two limitations, an inability to attend and concentrate, as well as an inability to withstand stress, would not exist in the absence of Plaintiff's present or past drug abuse.

## IT IS THEREFORE RECOMMENDED THAT

The decision of the Commissioner by **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

June 22, 2009

Timothy S. Hogan
United States Magistrate Judge

21

**NOTICE TO PARTIES REGARDING FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **fifteen (15) days** after being served with this Report and Recommendation. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).